UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:13CR19(JCH) |
| | : | |
| v. | : | |
| | : | |
| JESSE C. LITVAK | : | May 12, 2016 |

### GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE EVIDENCE REGARDING OTHER BROKER-DEALERS

The Government respectfully requests that the Court issue an order precluding the defendant Jesse C. Litvak from introducing evidence or argument regarding events or practices at broker-dealer firms other than Jefferies, absent some factual link to Litvak.

### BACKGROUND

The Government anticipates that at trial Litvak will attempt to introduce evidence regarding the behavior of other broker-dealer firms with which he has no apparent connection.

At the request of the defense, the Government has produced voluminous materials gathered or created in the course of other investigations into allegations of similar fraud schemes at other broker-dealers trading fixed income products, despite there being no evidence that Litvak was aware of any malfeasance by traders at most of these other firms. The defendant has suggested through correspondence that he believes, notwithstanding Litvak's ignorance of these other fraudulent trades, they somehow bear on materiality or intent. As discussed below, the Government disagrees.

Now, in the defense's April 25, 2016 letter concerning experts (excerpted in relevant part as Ex. 1hereto), Litvak announced that two of his proposed experts—Philip R. Burnaman III and John Dolan—may offer opinions based on an news article entitled, "Nomura Warned Against Lying After Jefferies Trader Charged" (Exhibit 2 hereto). *See* Ex. 1 at 5 (¶¶ 9, 10) & 16

(¶ 12(a)).  That article, published on April 6, 2016, concerns a motion hearing in a case pending before Judge Chatigny, *United States v. Shapiro, et al.*, 3:15-cr-155(RNC), in which three former RMBS bond traders at Nomura Holdings have been charged with perpetrating a similar fraudulent scheme to Litvak.  During that hearing, an Assistant United States Attorney described the Government's evidence about 1) after Litvak was indicted in January 2013, Nomura held a training session for its employees using a document instructing them "do not lie," 2) afterwards, one defendant told Nomura employees to heed that warning, and 3) despite this, another defendant proceeded to conduct an allegedly fraudulent trade.

As the defense is aware, there are a number of broker-dealers like Nomura which are under investigation for their trading practices in certain fixed income products, including RMBS bonds.  Moreover, two traders at RBS Securities have pled guilty to conspiracy to commit securities fraud in connection with a fraudulent scheme similar to Litvak's.

## ARGUMENT

Evidence concerning acts or events at broker-dealers other than Jefferies—including admitted or alleged fraud by their traders, or another firm's attempts at to remediate or prevent fraud—should be precluded under Rules 401 and 403.

Events at other broker-dealers do not tend to make any fact at issue in this trial "more or less probable than it would be without th[at] evidence."  Fed. R. Evid. 401.  While the Government has the burden of proving each element of securities fraud, the principal disputed issues are likely to be materiality and intent.  As a matter of logic, the fact that non-Jefferies traders may have committed similar crimes does not bear on any fact concerning Litvak, including whether a reasonable investor would have found Litvak's misstatements important or whether Litvak had the intent to deceive his victims.

In the first trial, the Court precluded evidence of trades containing misrepresentations by other Jefferies traders, absent evidence of Litvak's knowledge of the trade. Feb. 26, 2014 Trial Tr. at 1472. The Second Circuit reversed and held that, because this evidence could tend to show that Jefferies supervisors regularly approved of other traders making misrepresentations, it might provide "a fair basis upon which to infer that when Mr. Litvak did the very same thing, . . . the supervisors saw and approved of [it] as standard operating procedure." *United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015) (editing in original).

Here, there is not even this slender factual connection between Litvak and the conduct at other broker-dealer firms. There no reason to believe that Litvak was even aware of bond trades executed by his competitors, much less knew that they were made using misrepresentations. If Litvak can establish, either through documents or testimony, some connection between the facts of this case and events at other broker-dealers such that the other fraudulent trades are relevant to an element of the crime, then evidence of those events may be admissible. But absent a link between Litvak and traders at other broker-dealers, the defense should not be permitted to ask the jury to speculate that crimes by other traders at other firms tended to have some impact on Litvak or his victims.

Moreover, at least some of this evidence is temporally unconnected to the facts of this case. For instance, the Nomura meeting that Litvak's experts relied on in forming their opinions occurred too late to have anything to do with Litvak's alleged crimes. The news article relied on by his experts concerns events at Nomura after Litvak's indictment in January 2013. Whatever actions other firms took in 2013 to address or prevent similar crimes by their employees indicates nothing at all about the charged scheme to defraud, which Litvak is alleged to have

perpetrated from approximately 2009 to approximately December 2011, when he was terminated by Jefferies.

Even if this evidence were relevant to the charged crime, the Court should exclude it under Rule 403.  Litvak should not be allowed to develop an improper "everybody else did it" defense by introducing evidence concerning fraud or attempts to prevent fraud at other firms. Such evidence would almost certainly confuse the issues, mislead the jury, create undue delay and waste time, all in service of little, if any, probative value.  Fed. R. Evid. 403.

## CONCLUSION

The Court should issue an order precluding the defense from introducing evidence or making argument regarding acts or events at other broker-dealer firms unless it can first establish a factual nexus with Litvak or the charged crime.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

　　　　/s/
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov
HEATHER L. CHERRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv07037
heather.cherry@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700

- 5 -

## **CERTIFICATE OF SERVICE**

      I hereby certify that on May 12, 2016, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

                                        /s/
                            JONATHAN N. FRANCIS
                            ASSISTANT UNITED STATES ATTORNEY

# EXHIBIT 1

LAW OFFICES
# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

C. J. MAHONEY
(202) 434-5253
cmahoney@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

April 25, 2016

<u>Via Email</u>

Jonathan N. Francis
Heather L. Cherry
United States Attorney's Office
District of Connecticut
Connecticut Financial Center
157 Church Street, Floor 23
New Haven, CT  06510

Re: <u>United States v. Litvak</u>, Case No. 3:13-cr-00019-JCH

Dear Counsel:

Pursuant to Fed. R. Crim. P. 16(b)(1)(C)(i), Mr. Litvak provides notice that, should there be a defense case, he may call the below-listed expert witnesses. Mr. Litvak reserves all rights, including the right to update, amend, and/or supplement the summaries of testimony set forth below based on further developments, including additional documents received or Court orders.

1) **Phillip R. Burnaman III**

   A) <u>Qualifications</u>:

   Mr. Burnaman has over thirty years of experience in mortgage and structured finance. He began his career in finance in 1983 at EF Hutton & Company, where he built and analyzed residential mortgage cash flow models and assisted with mortgage securitizations. In 1986, along with superiors from EF Hutton, Mr. Burnaman joined a start-up financial guarantor, Financial Security Assurance (now part of Assured Guaranty). There, Mr. Burnaman was involved in expanding securitization of mortgage finance to the United Kingdom. In 1990, Mr. Burnaman joined Citigroup Securities, where he was responsible for the acquisition of over $700 million of residential, commercial, and consumer loan portfolios.

   In 1994, Mr. Burnaman joined ING Bank as a portfolio manager and was responsible for a portfolio of $500 million of RMBS, CMBS, and distressed real estate debt. In that role, Mr. Burnaman was a buy-side portfolio manager, who

WILLIAMS & CONNOLLY LLP

Jonathan N. Francis
Heather L. Cherry
April 25, 2016
Page 5

9. Mr. Burnaman may offer the opinion that any reasonable investor would heavily discount the value of unverified information by any trader, salesperson, or analyst and that, accordingly, such information would not be important to the investment decision regarding the purchase or sale of a non-agency RMBS. Mr. Burnaman may also opine that a reasonable investor would discount the value of unverified information based on indications that traders routinely provide false information. *See, e.g.*, DOJ OTHER-000494 and Exhibit 4 (Bloomberg, *Nomura Warned Against Lying After Jefferies Trader Charged*, Apr. 6, 2016).

10. Mr. Burnaman may describe standard industry compliance programs and indications about how those programs have changed in recent years. *See, e.g.*, Exhibit 4 (Bloomberg, *Nomura Warned Against Lying After Jefferies Trader Charged*, Apr. 6, 2016).

2) **John Dolan**

   A) Qualifications:

   Mr. Dolan has over thirty years in trading, structuring, investing in, and valuing structured securities products, including residential mortgage-backed securities.

   Mr. Dolan has held executive and senior-level positions at large portfolio management firms and investment banks. Mr. Dolan has previously been the Chief Investment Officer of Hyperion Capital Management, Managing Director at Bankers Trust Global Investment management, Managing Director at Salomon Brothers, and Vice President and Head of the MBS trading desk at Citi Bank.

   Mr. Dolan served as President of the Fixed Income Analysts Society, as a Member of the Board of Directors of the Public Securities Association, and as Chairman of the Public Securities Association's MBS division.

   Mr. Dolan received a B.A. in Economics and Mathematics in 1975 from Union College. Mr. Dolan received an M.B.A. in finance in 1977 with a focus on financial markets from the Wharton Graduate Business School at the University of Pennsylvania.

   A copy of Mr. Dolan's CV is attached.

WILLIAMS & CONNOLLY LLP

Jonathan N. Francis
Heather L. Cherry
April 25, 2016
Page 16

> to transact with Jefferies at prices higher than the prices available from other firms unless it was in the interest of these buy-side firms to do so. If lower prices were available, the buy-side accounts likely would have traded away from Jefferies. The fact that the buy side account chose to transact with Jefferies indicates that Jefferies in all likelihood had the best price (or only price) for a transaction of the size in the market at the time.
>
> b. From the buy-side account's perspective, one could only say that the price component of a trade execution was poor in terms of a comparison to what was available from other broker-dealers. If the price negotiated was the only price available in the market there would be no basis to conclude that the execution was poor and that the price should have been better.

12. <u>Importance of Broker-Dealer Compliance Function</u>: Based upon Mr. Menchel's extensive experience in the securities industry and as a securities regulator, Mr. Menchel may offer his expert opinion on role of the compliance function in a broker-dealer generally. With regard to training, Mr. Menchel may opine that:

   a. Internal compliance training is important in brokerage firms. Through training, the compliance function at a broker-dealer distills the securities industry's many rules to provide clarity to brokers, traders, and sales representatives on how to conduct themselves. Internally within a firm, the interpretation of the compliance staff on what is permissible is very important and is appropriately understood by the employees of that firm as authoritative. He may opine on changes in industry compliance programs in recent years. *See* DOJ OTHER-000494 and Exhibit 4 (Bloomberg, *Nomura Warned Against Lying After Jefferies Trader Charged*, Apr. 6, 2016).

13. <u>Trade Specific Opinions</u>: Mr. Menchel may offer the opinion that each of Jefferies's counterparties to the charged trades is a QIB.

   C) **Walter Torous**

A) <u>Qualifications</u>: Dr. Torous is a Senior Lecturer at the Massachusetts Institute of Technology, holding a joint appointment in the Center for Real Estate and the Sloan School of Management. His areas of research include real estate markets, the pricing of financial instruments, mortgage financing generally and mortgage-

# EXHIBIT 2

Case 3:13-cr-00019-JCH   Document 372   Filed 05/12/16   Page 10 of 12

# Nomura Warned Against Lying After Jefferies Trader Charged

Robert Gearty　　　Chris Dolmetsch
　　　　　　　　　　ChrisDolmetsch
April 6, 2016 — 4:50 PM EDT
Updated on April 6, 2016 — 10:33 PM EDT

▶　Charges against ex-Jefferies trader spurred training session

▶　At least one allegedly fraudulent trade done after session

Nomura Holdings Inc. held a training session after a former Jefferies & Co. managing director was indicted for fraud and encouraged its traders not to lie -- but that didn't stop the fibbing to customers about bond prices, according to U.S. prosecutors.

Three former Nomura traders are accused of increasing the spread on their trades and generating about $7 million in additional revenue by lying about how much they paid for debt. Ross Shapiro, Michael Gramins and Tyler Peters pleaded not guilty and are scheduled to go to trial in October.

The session at the Japanese bank was called to discuss the indictment of ex-Jefferies trader Jesse Litvak, who was arrested in January 2013 for misleading customers on the prices of mortgage bonds, Assistant U.S. Attorney Liam Brennan said Wednesday at a hearing in Hartford, Connecticut.

Two of the indicted employees were present at the session, where attendees were given a handout telling them "do not lie." Shapiro afterwards held an "all hands on deck" meeting of traders on the residential mortgage-backed securities desk and told them to heed the warning, Brennan said. Yet despite that, one of the fraudulent trades took place after that meeting, Brennan said.

Nomura spokesman Jonathan Hodgkinson didn't immediately respond to a telephone message and an e-mail seeking a response to Brennan's comments.

## U.S. Crackdown

The Nomura case is the latest to emerge from a U.S. crackdown on deceptive practices in the bond market that is continuing even after an appeals court threw out Litvak's conviction late last year and ordered a new trial. A former Royal Bank of Scotland Group Plc trader pleaded guilty to lying to customers in December, shortly after the appeals court decision, becoming the bank's second employee to admit to fraud charges in

the probe.

Dozens of mortgage-bond traders have been suspended, put on leave or fired as the U.S. probes tactics used in the market for complex debt. A handful of traders were indicted. The crackdown has shed a light on the opaque world of bond trading and raised questions about what kind of sales tactics are appropriate.

Lawyers for the three men have asked U.S. Judge Robert Chatigny to dismiss allegations that they committed wire fraud, saying the indictment doesn't show they meant to harm the counterparties in the trades.

"I don't see how the alleged misrepresentations can be construed as an intent to harm," said Joshua Klein, an attorney for Shapiro.

## Separate Trials

Peters has asked to be tried separately. His attorney, Brett Jaffe, argued that his client conducted the trades in good faith and without criminal intent because Shapiro, his supervisor, believed he wasn't doing anything wrong. He taught Peters that the way he was conducting business was legal, the lawyer said.

Prosecutors argued that holding two trials would inconvenience both the government and witnesses. The judge declined to rule immediately on the requests.

The allegedly fraudulent trade that occurred after Nomura held the training session was handled by Peters, Brennan said. Jaffe told the judge his client wasn't at the training session and didn't attend the meeting called by Shapiro afterwards. Guy Petrillo, who also represents Shapiro, declined to comment on Brennan's statements after the hearing.

Litvak's retrial is scheduled for July.

The case is U.S. v. Shapiro, 3:15-cr-00155, U.S. District Court, District of Connecticut (New Haven).

Before it's here, it's on the Bloomberg Terminal.

• Nomura Holdings Inc