**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA                    CASE NO. 3:13CR19 (JCH)

v.

JESSE C. LITVAK                             APRIL 10, 2017

              Defendant.

_____/

## SENTENCING MEMORANDUM ON BEHALF OF JESSE C. LITVAK

Dane H. Butswinkas (phv07986)
Adam D. Harber (phv07988)
C.J. Mahoney (phv08039)
Katherine A. Trefz (phv08040)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

-and-

Ross H. Garber (ct17689)
Michael G. Chase (ct28935)
SHIPMAN & GOODWIN LLP
1 Constitution Plaza
Hartford CT 06103

*Attorneys for Jesse Litvak*

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ......................................................................................1

II. JESSE LITVAK'S PERSONAL HISTORY AND CHARACTERISTICS .......................4

III. A SENTENCE OF HOME CONFINEMENT IS REASONABLE AND
     APPROPRIATE IN THIS CASE. ...................................................................................10

     A.  A Sentence in Excess of the 2014 Sentence Would Violate Due Process.............10

     B.  The Guidelines Authorize a Sentence of 8-14 Months' Home
         Confinement...........................................................................................................10

     C.  The PSR Range of 108-135 Months Is Incorrect....................................................11

         1.  There Was No Loss on Count 4 .................................................................12

         2.  The Additional 75 Transactions the Government Relies Upon Are
             Not "Relevant Conduct" and Resulted in No Loss....................................15

         3.  There Should Be No § 2B1.1(b)(2)(A)(i) Enhancement. ..........................25

         4.  The Court Should Depart from the Guidelines if it Adopts the
             Government's View of Relevant Conduct and Loss..................................25

     D.  A Sentence of Home Confinement Is Reasonable and Appropriate Under
         the 18 U.S.C. § 3553(a) Factors............................................................................28

         1.  Section 3553(a)(1): A Sentence of Home Confinement Fits the
             Offense and the History and Characteristics of Jesse Litvak....................28

         2.  Section 3553(a)(2): A Sentence of Home Confinement is
             Consistent with the Objectives of Sentencing. ..........................................35

         3.  Section 3553(a)(3)-(4): A Sentence of Home Confinement is
             Authorized under the Guidelines. ..............................................................39

         4.  Section 3553(a)(6): A Sentence of Home Confinement Would Not
             Result in Unwarranted Sentencing Disparities. .........................................39

IV. CONCLUSION.................................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Alabama v. Smith*, 490 U.S. 794 (1989) ....................................................10

*Gall v. United States*, 552 U.S. 38 (2007) ................................................39

*Jones v. United States*, 135 S. Ct. 8 (2014) (Scalia, J., dissenting from denial of certiorari) ..............................................................................16

*Kimbrough v. United States*, 552 U.S. 85 (2007) ..........................................11

*Rita v. United States*, 551 U.S. 338 (2007) ................................................11

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...................7, 29, 34

*United States v. Ahmad*, 202 F.3d 588 (2d Cir. 2000) .................................18

*United States v. Alphas*, 785 F.3d 775 (1st Cir. 2015) ...........................12, 13, 15

*United States v. Baylor*, 97 F.3d 542 (D.C. Cir. 1996) (Wald, J., concurring) ...........16

*United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995) .............................27

*United States v. Bruce*, No. 3:15-cr-00016-AWT (D. Conn.) .........................40

*United States v. Bryce*, 287 F.3d 249 (2d Cir. 2002) ................................10

*United States v. Buffis*, No. 3:13-cr-30028 (D. Mass. Apr. 20, 2016) ..............17

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ............................10, 34

*United States v. Coleman*, 370 F. Supp. 2d 661 (S.D. Ohio 2005) ................17, 19

*United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992) (Newman, J., dissenting from the denial of a request for rehearing in banc) ............................16

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) (Underhill, J., concurring) .......34

*United States v. Costello*, 16 F. Supp. 2d 36 (D. Mass. 1998) .....................27

*United States v. Diambrosio*, No. 2:04-cr-00066-BWK, 2008 WL 732031 (E.D. Pa. Mar. 13, 2008) ....................................................40

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) ..............................10

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) ..............................12

*United States v. Forchette*, 220 F. Supp. 2d 914 (E.D. Wis. 2002)..............................27

*United States v. Frias*, 39 F.3d 391 (2d Cir. 1994) (Oaks, J., concurring)....................16

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) .....................................................40

*United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996) ..................................................27

*United States v. Mullings*, 131 F. Supp. 3d 1, 4 (E.D.N.Y. 2014) ..................................29

*United States v. Musgrave*, 647 Fed. App'x 529 (6th Cir. 2016) ...................................40

*United States v. Oakford Corp.*, 79 F. Supp. 2d 357 (S.D.N.Y. 1999)............................27

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (Block, J.) ...................34

*United States v. Pimental*, 367 F. Supp. 2d 143 (D. Mass 2005) ...................................17

*United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012)............................................26, 40

*United States v. Recck*, No. 3:15-cr-0015-JAM (D. Conn.) ...........................................40

*United States v. Redemann*, 295 F. Supp. 2d 887 (E.D. Wisc. 2003)...........................27

*United States v. Roberts et al.*, No. 3:08-cr-00175-PLR-CCS (E.D. Tenn.) ................40

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) ......................................................15

*United States v. Strain*, No. 1:13-cr-00906-GBD (S.D.N.Y.)  ......................................40

*United States v. Stuart*, 22 F.3d 76 (3d Cir. 1994).........................................................27

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) ..........................................15

*United States v. Thomas*, No. 3:13-cr-00003-JBA (D. Conn.) .......................................40

*United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005)............................................16, 17

*United States v. Washington*, 38 F. Supp. 2d 21 (D.D.C. 1999)...............................18, 24

*United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010) (Gertner, J.)....................34

*United States v. Watts*, 519 U.S. 148 (1997) (Stevens, J., dissenting)............................16

*In re Chin*, No. 3-17394, Order Instituting Administrative and Cease-and-Desist
 Proceedings (Aug. 16, 2016) .......................................................................................31

*In re Bonacci*,  No. 3-17575, Order Instituting Administrative and Cease-and-
 Desist Proceedings (Sept. 26, 2016) ...........................................................................31

## OTHER AUTHORITIES

15 U.S.C. § 78ff(a) ...............................................................................................................11

18 U.S.C. § 3553(a) ...................................................................................................... passim

28 U.S.C. § 994(m) ..............................................................................................................34

U.S.S.G. Chapter 1, pt. A § 4(b) .........................................................................................25

U.S.S.G. Chapter 5, pt. A ....................................................................................................39

U.S.S.G. § 1B1.3 ....................................................................................................15, 18, 20

U.S.S.G. § 2B1.1 ..........................................................................................................passim

U.S.S.G. § 3D1.2 .................................................................................................................18

U.S.S.G. § 5C1.1 ...........................................................................................................11, 39

Frank O. Bowman, Comment on Proposed Amendments to the Economic Crime
   Guideline, § 2B1.1 (Feb. 19, 2015) ...........................................................................34

U.S. Sentencing Comm'n, Statistical Information Packet, Fiscal Year 2014
   (Second Circuit) .........................................................................................................34

U.S. Sentencing Comm'n, Statistical Information Packet, Fiscal Year 2015
   (Second Circuit) .........................................................................................................35

## I.      PRELIMINARY STATEMENT

In 2014, Jesse Litvak stood before this Court at sentencing after being convicted on 15 counts.  The government sought a 9 to 11 year term of imprisonment, which would have meant that Mr. Litvak's children, then ▇▇▇▇▇▇▇▇ would have been deprived of their father and primary caregiver for most of their formative years.  The Court rejected that extreme recommendation, varied from the Sentencing Guidelines range it calculated, and sentenced Mr. Litvak to a term of 24 months imprisonment and a $1.75 million fine.

Three years hence, the factors that bear on sentencing have changed dramatically and only in ways that militate in favor of lesser punishment:

- The conviction count is down from 15 to 1.  The Court of Appeals found the evidence insufficient to support five of the original convictions.  At his retrial, the jury rejected the government's overly simplistic theory of this case—*i.e.*, that a lie told in RMBS negotiations is material *per se*—and acquitted on 9 of the 10 remaining counts.

- As to the sole Count on which Mr. Litvak was convicted (Count 4, fraud in connection with the sale of SARM 2005-21 7A1, to Invesco Ltd., on July 1, 2010), the alleged "victim," Invesco's Brian Norris, essentially admitted at trial that Invesco suffered no monetary loss as a result of the purported fraud.  This key admission was not part of the 2014 sentencing record.

- In the 2014 sentencing, the government justified a custodial sentence, in part, on the ground that Mr. Litvak not only had violated the law, but that he had abused a relationship of "trust" with his counterparties.  July 23, 2014 Hr'g Tr. at 99:12-25.  Yet at oral argument in the appeal, the government was forced to abandon the argument that Mr. Litvak was an "agent" for his counterparties; the Court instructed the jury in the

second trial that Mr. Litvak was not an agent; and, in its post-trial brief, the government
admitted, not only that there was no agency relationship between Mr. Litvak and any of
his counterparties, but that there was not even a non-agency relationship of trust between
Mr. Litvak and Mr. Norris.  *See* D.E. 520 at 11.

- The government recently resolved, via SEC administrative orders, two matters with
  RMBS traders from leading investment banks who were found to have engaged in
  conduct ***identical*** to what was alleged in the indictment in this case and on a comparable
  scale.  These individuals were fined but no criminal charges have been filed against them.
  Moreover, it has become apparent that the U.S. Attorney's Office has decided not to
  prosecute two other Jefferies & Co. employees who likewise lied to counterparties in
  RMBS negotiations.  These two individuals incurred only minor sanctions by FINRA, the
  industry regulator.  One of them, Mr. Litvak's former boss William Jennings (an alleged
  but unindicted participant in the conduct in this case, who knew about and encouraged
  Mr. Litvak's negotiating tactics), received a $10 million exit payment that more than
  offset the $30,000 fine he paid to FINRA.  These resolutions are highly relevant to the
  Court's assessment of the seriousness of the offense.

- Mr. Litvak and his family have moved from New York to Florida, where Mr. Litvak's
  wife, Dr. Renee Litvak, has developed a demanding endodontics practice and has become
  the family's primary earner.  Mr. Litvak, by contrast, is now firmly ensconced in his role
  as the primary caregiver for the couple's two children, ███████████████████
  ███████████

While much has changed since 2014, all indications are that the government's position on
sentencing has not.  In its submissions to the Probation Office, the government recommended the

*exact same guidelines calculation* as in 2014—9 to 11 years (108 to 135 months).  By seeking a sentence based on acquitted and uncharged conduct, the government seems poised to ask for a sentence *in excess* of what the Court imposed when the conviction count stood at 15, rather than 1.  A term that exceeds what the Court imposed last time not only would be unreasonable but unconstitutional as well.

At bottom, the government is attempting to compensate for its mostly unsuccessful prosecution of Mr. Litvak by urging sharp sentencing enhancements based on acquitted and uncharged conduct.  While the Court has discretion to consider such conduct at sentencing, it should not do so here.  As the Court knows, the jury in this case served for nearly a month.  The jurors deliberated for nearly as long as they heard evidence.  And while the defense believes that the conviction on Count 4 is deficient as a matter of law, by suggesting that Mr. Litvak's sentence be enhanced on the basis of the supposed "loss" to investors in Counts 1-3, 5, 6, and 8-10, the government essentially is seeking to overturn the jury's verdict on the *9* other counts.  The government further seeks a sentencing enhancement based on the "loss" attributable to 66 additional uncharged transactions, the large majority of which are supported by no evidence aside from Bloomberg chats and trade tickets.  In so doing, the government asks the Court to calculate "loss" in a manner that is inconsistent with its jury charge, which properly instructed that whether a misstatement is material (and hence capable of causing loss) "is a very fact-specific inquiry" which must be undertaken on a case-by-case basis.  *See* Jury Instr. No. 35.

The punishment the defense requests is 8 months of home confinement and a $250,000 fine.  The term and manner of confinement is within the recommended Sentencing Guidelines range, if calculated correctly.  The requested fine alone is more than 3 times higher than the loss the government calculates as to Count 4 (and, as discussed, the evidence at trial proved that, in

fact, there was no loss) and more than 28 times higher than any plausible measure of personal gain.

This sentence is proportionate to the seriousness of the offense—especially when one considers that the government has treated similar instances of dealer misconduct as regulatory, not criminal matters.  It is eminently just and reasonable when considered in light of Mr. Litvak's personal history and his role as the primary caregiver ███████████████   When combined with the collateral consequences Mr. Litvak has faced and will continue to face as a result of these proceedings—namely irreparable reputational damage and the near-certain likelihood of a lifetime ban from the only industry he has ever worked in as an adult—this sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).

## II.  JESSE LITVAK'S PERSONAL HISTORY AND CHARACTERISTICS

In connection with the 2014 proceedings, the Court learned much about Jesse Litvak, his upbringing, education, life, career, and character.  *See* D.E. 262 at 5-19.  Mr. Litvak, now 42, was raised in Colorado, attended college at Emory University, and thereafter joined Greenwich Capital, where he worked for over a decade until the team he worked with moved to Jefferies in 2008.  *Id.*  As evidenced by the numerous letters the Court has received in connection with this proceeding and the prior one, Jesse consistently has shown a "quiet, sincere care and love for those around him."  Ex. A at 53 (R. Short Letter).  In this Sentencing Memo, we highlight what has changed in Jesse's life since 2014.[1]

Nearly 3 years have passed since the first sentencing.  In that time, the Litvaks have done their best to move forward with their lives, despite the dark shadow cast over them by a 5-year-

---

[1] Attached as Exhibit A to this Memorandum are letters submitted in support of Mr. Litvak.

long federal prosecution.  The key development in their lives over the past 3 years was their relocation from New York to Florida.  The move was necessitated in large part by Jesse's diminished employment prospects in New York as well as Jesse and Renee's desire to insulate their children from the fallout of this case, which, as the Court knows, has received significant attention in the tri-state media.  As a consequence of the move, the Litvaks lost the day-to-day support infrastructure they had from friends and family in New York.  Ex. A at 37 (M. Kunen Letter).  And Dr. Litvak has had to rebuild her practice "from square one." *Id.*  But Jesse and Renee decided that the benefits of leaving New York and relocating to a place with a lower cost of living was in their children's best interest under the circumstances.

One consequence of the move is that Jesse is even more firmly established in his role as the primary caretaker for the couple's two children, ███████████████ than he was in 2014.  As Renee affirms, the "burden of meeting the children's needs on a day to day basis . . . falls on Jesse."  Ex. A at 2 (Dr. R. Litvak Letter).  Renee, by contrast, is the family's primary breadwinner, working full time as an endodontist.[2]  This is a reversal of the roles Jesse and Renee played prior to Jesse's firing from Jefferies.  Dr. Litvak's demanding practice—which now is essential to the family's livelihood—would not be possible without Jesse's day-to-day involvement in the children's lives.  *Id.*

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

---

[2] In connection with their move to Florida in 2015, Dr. Litvak worked to get her Florida dental license and started practicing locally there as a root canal specialist working with several established dentist offices.



\*    \*    \*

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). The Bloomberg chats the government highlighted at trial do not tell the whole story of Jesse Litvak's life. And they say nothing about the life he leads today.

---

[3] All emphases are added unless otherwise noted.

In this proceeding as in the last one, the Court has received over 120 letters from people who have known and interacted with Jesse in all phases and aspects of his life. To a person, they attest that there is much good in Jesse Litvak. As family friend Polly Blitzer put it, "Jesse's days are infused with private acts of humanity, compassion, and decency." Ex. A at 24 (P. Blitzer Letter). The Court carefully reviewed the letters submitted in 2014; the defense urges it to do the same this time around. What they reveal are exactly what Ms. Blitzer describes—whether it's reaching out to a cousin who was the victim of domestic violence when others thought the subject too awkward to discuss, *id.* at 43-44 (Fr. M. Noonan Letter 2014), providing shelter to a great uncle who was forced to relocate from his apartment after Hurricane Sandy, *id.* at 45-46 (R. A. Noonan Letter), providing an ear or advice for other parents ██████████████████ ██████████████████ or taking time each year to comfort a friend on the anniversary of her brother's death on 9/11, *id.* at 30 (L. Keston Letter). It perhaps is not unusual for a person in Jesse's position to find friends and relatives willing to say nice things about him at a time like this. But the anecdotes in the 120-plus letters the Court has received need no embellishment. What they show is that "[i]t's unreal how Jesse 'shows up' for the people who love him." *Id.* at 48 (R. Simon Letter). That doesn't nullify the conviction; but it is a factor that should be taken into account at sentencing.

The Court should also bear in mind what living with this case for half a decade has been like for the Litvaks. In her letter, Renee describes this unusually long proceeding as 5 years "stuck in Purgatory." *Id.* at 3 (Dr. R. Litvak Letter). As the Court knows, Jesse has put on a brave face throughout these proceedings. But, his parents, Nancy and Steven, note the emotional toll the past five years have taken on their son:

> While he has made the most of these years as a stay-at-home dad, nurturing his family and working on his entrepreneurial skills, absence from the workforce does

have the effect of stripping away one's confidence and self-esteem.  Phone calls
remain unreturned.  Friends drift away.  It is isolating and defeating.  He and Renee
relocated from their home base in NYC to start over.  He has lost so much.

*Id.* at 7-8 (S. & N. Litvak Letter 2017).

Moreover, even if Jesse faced no punishment from this Court, "[he] and his family live

with this all of their days." *Id.* at 7.  After the last trial, the SEC barred Jesse from ever working

in the securities industry again.  The bar was lifted after the appeal but almost certainly will be

reinstated.  And it goes without saying that the internet trail left by these proceedings will be a

major barrier to future employment.[4]

Jesse's cousin, Father Mark Noonan, perhaps puts it best when he urges the Court to

"[b]ear[] in mind the goodness and kindness with which Jesse has lived and continues to live his

daily life, as well as the massive burdens and sorrows he and his family have already borne in

these recent years." *Id.* at 42 (Fr. M. Noonan 2017 Letter).  In his new life, Mr. Litvak works

hard every day to make up for the shame and hardship his family has suffered as a result of his

actions.  He desires not only to protect his children from suffering additional pain as a result of

the mistakes he made years ago, but to ensure that they avoid making similar mistakes in their

own lives.  *Id.* at 2 (Dr. R. Litvak Letter).  Under these circumstances and in view of all of the

facts relevant under Section 3553(a), a term of imprisonment would be greater than necessary to

accomplish the goals of sentencing.

---

[4] Mr. Litvak's conditions of release require that he seek and maintain employment.  In addition to his primary
caregiver role, he has complied with this provision by working with a ticket sales business run by family friends.

### III.   A SENTENCE OF HOME CONFINEMENT IS REASONABLE AND APPROPRIATE IN THIS CASE.

#### A.   A Sentence in Excess of the 2014 Sentence Would Violate Due Process.

A sentence beyond 24 months (of the kind the government appears poised to advocate) presumptively would violate the Due Process Clause. A defendant cannot be punished for having successfully appealed a criminal conviction. *See Alabama v. Smith*, 490 U.S. 794, 798 (1989). That presumption can be overcome only by new and "objective information in the record justifying the increased sentence." *United States v. Bryce*, 287 F.3d 249, 256 (2d Cir. 2002).

There is no such evidence here. The government added no new charges or allegations to the indictment prior to the second trial; the evidence it presented in support of the remaining ten counts essentially was the same as at the first trial; and there is no other new, relevant information that would justify a higher sentence. The most salient differences between the sentencing records in 2014 and today militate in favor of a much lower sentence—*viz.* a single conviction instead of 15 and new testimony from the supposed "victim" in the Count 4 trade proving that it suffered no injury.

#### B.   The Guidelines Authorize a Sentence of 8-14 Months' Home Confinement.

The Court's duty at this stage is to impose a punishment "sufficient but not greater than necessary" to accomplish the objectives of the federal sentencing statute. 18 U.S.C. § 3553(a); *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010). As the Court recognized in 2014, a sentencing court cannot presume that a Guidelines-range sentence is reasonable. Instead, it "must conduct its own independent review of the sentencing factors" set forth in Section 3553. *United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008). And to the extent the Guidelines calculation results in an unreasonable sentence, the Court must sentence outside the Guidelines

range.  *See Rita v. United States*, 551 U.S. 338, 350-51 (2007); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

There is no need to do so here, however, provided that the Guidelines range is calculated in the right way.  The correct Guidelines calculation in this case results in a range of 8-14 months.  This range results from:

- A base offense level of 7, U.S. Sentencing Guidelines Manual § 2B1.1(a) (2016) (hereinafter "U.S.S.G."), because Mr. Litvak was convicted of violating 15 U.S.C. § 78ff(a), which imposes a maximum term of imprisonment of 20 years or more;

- A 4-level enhancement pursuant to § 2B1.1(b)(19)(A)(ii), because Mr. Litvak worked for a broker-dealer at the time of the conduct at issue; and

- A Criminal History Category of I, because Mr. Litvak has no prior criminal history.

The resulting Total Offense Level of 8 corresponds to a term of 8-14 months.  This range fits within Zone B of the sentencing table.  The Guidelines expressly authorize home confinement for Zone B terms.  *See* U.S.S.G. § 5C1.1(c)(3) & cmt. n.3(B).

## C.    The PSR Range of 108-135 Months Is Incorrect.

The PSR recognizes that the parties have "widely divergent views of the offense conduct," and recommends that they be given a full opportunity to present these views to the Court at the hearing.  PSR ¶ 75.  As was the case in 2014, the primary driver of the parties' divergent calculations is their disagreement over the "loss" attributable to Mr. Litvak's conduct.  The government puts the total "loss" at $6.332 million, of which only $73,018 is attributed to the only count it won at trial.  $1,165,322.32 is attributed to nine counts on which the jury acquitted.  The rest is attributed to uncharged conduct.  And, as to Count 4, the government thus far has made no effort to justify the $73,018 "loss" calculation in light of Mr. Norris's trial testimony.

11

All told, the government's unsupported and counterfactual "loss" calculation adds *18 levels* to the offense calculation under U.S.S.G. § 2B1.1(b)(1)(J).  The Court should reject the government's proposed loss enhancement for the reasons that follow.

### 1.      There Was No Loss on Count 4

At the threshold, it is important to note that how the Court rules on Mr. Litvak's post-trial motion should not dictate how it rules on whether there was a "loss" on Count 4.  The concepts of loss and materiality certainly are related but not identical:  A statement can be "mix altering" and therefore material without causing a loss.  Indeed, as the Court properly instructed the jury, loss is not an element of a Section 10(b) criminal offense.  Thus even if the Court finds the evidence on Count 4 sufficient as to materiality, that does not settle the question of "loss" under the Guidelines.  Here the government cannot prove "actual" or "intended loss" by a preponderance of the evidence.  U.S.S.G. § 2B1.1 cmt. n.3.

*The government cannot prove "actual loss."*   "Under the sentencing guidelines, loss generally does not include the sums that a victim *would have paid to the defendant absent the fraud*."  *United States v. Alphas*, 785 F.3d 775, 781 (1st Cir. 2015); *see also United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) (the "loss must be the result of the fraud").  Here, Mr. Norris confirmed "if Jesse had followed [his] instruction and put in the bid of 79-24 that [he] authorized, [he] would have paid 79-30," *i.e.*, the price Mr. Norris ended up paying.  Tr. 765:21-766:13.  Thus even "absent the fraud," the price would have been the same.  That testimony—which was not given at the first trial—precludes any finding of actual loss in connection with Count 4.  And even if Mr. Norris had not made this concession expressly, the evidence showed that, prior to any misstatement by Mr. Litvak, Mr. Norris had set a floor on the price at the outset of the negotiations by effectively telling his counterparty he was willing to pay 79-30 "with room."  *See* D.E. 516 at 13-15 (Feb. 10, 2017).  Invesco therefore had no reasonable expectation

of paying lower than 79-30 under these circumstances and cannot be said to have suffered any "actual loss."

Notably, the key question here is not what Invesco would have paid had it discovered the fraud, but what it would have paid "absent the fraud." In *Alphas*, for example, the defendant was convicted of inflating the amounts he was owed under an insurance policy. 785 F.3d at 778. The insurer had the right to void the entire policy in the event of a false claim. *Id.* The issue in the case was whether the Guidelines "loss" amount should include not only the amount of the fraudulent claims but also the amount of claims that were legitimate but would have been void had the insurer learned of the fraud. *See id.* at 780-81. The Court held that the loss amount should exclude the legitimate claims, precisely because "loss" under the Guidelines is meant to capture what "result[s] from the offense" not what the defendant "would have been paid anyway" "absent the fraud." *Id.* at 783 (internal quotations omitted). This is critical here, because even though Mr. Norris said he would have negotiated for a lower price had he known Jefferies' true acquisition price, that testimony doesn't go to the right question. Insofar as "loss" under the Guidelines is concerned, the question is what Invesco would have paid "absent the fraud"; Mr. Norris's testimony confirms Invesco would have paid 79-30. This proves there was no "actual loss."

To the extent there was any "actual loss" in Count 4, the government's methodology comes nowhere close to quantifying it. The $73,018.53 "loss" the government calculates on Count 4 simply is the difference between the profit Mr. Litvak implied Jefferies was making on the trade and its actual profit. There are two flawed assumptions buried in this crude calculation: *First*, the government assumes that, but for the fraud, Invesco would have been able to negotiate for a lower price. Again that assumption was undermined by Mr. Norris's conduct in the

13

negotiations and his testimony that he had no reasonable expectation of paying a price lower than 79-30.  *Second*, the government assumes that in the hypothetical negotiations that would have ensued "absent the fraud" Invesco would have successfully recouped the ***full*** $73,018.53 in incremental profit Jefferies made a result of acquiring the bond at a lower price.  It doesn't take a doctorate in game theory (or the benefit of Mr. Norris's testimony) to conclude this outcome was impossible under the circumstances.

As a principal trading on his own account, Mr. Litvak had no obligation to pass on ***any*** of the $73,018.53 in savings to Invesco.  And given that his counterparty opened the negotiations by effectively revealing his willingness to pay 79-30 "with room," no rational, economically self-interested party in Mr. Litvak's position would have done so.  Yet the government presumes that, absent the fraud, Mr. Litvak would have capitulated entirely and handed the ***entire*** $73,018.53 savings to a counterparty who had indicated willingness to pay more.  There is no evidence in the record to support this illogical conclusion—indeed there was no evidence whatsoever about the price Jefferies would have agreed to absent the misstatement. Accordingly, there is no evidence Invesco suffered an "actual loss" on the Count 4 trade.[5]

***The government cannot show "intended loss."***  "Intended loss" differs from "actual loss" in that it "includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)."  U.S.S.G. § 2B1.1 cmt. n. 3(A)(ii).  But as with "actual loss," "intended loss" necessarily excludes sums that "would have been paid anyway" "absent the

---

[5] Nor is gain to Jefferies an appropriate measure of loss under the Guidelines.  Gain can be used "as an alternative measure of loss ***only if there is a loss*** but it reasonably cannot be determined."  U.S.S.G. § 2B1.1 cmt. n.3(B).  Here, Mr. Norris's testimony confirms there was no loss.

fraud." *Alphas*, 785 F.3d at 783.  Again, Mr. Norris's testimony proves Invesco would have paid 79-30 "absent the fraud."

Moreover, regardless of whether Mr. Litvak acted with an intent to deceive, he made no misrepresentation that went to the heart of the bargain, which is necessary to support a finding of "intended loss" as a matter of law.  As the Court knows, there is a robust body of case law in the mail and wire fraud context discussing the seemingly indistinguishable concept of "intended harm."  Those cases hold that "intent to harm" requires a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."  *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (internal quotations omitted); *see also United States v. Takhalov*, 827 F.3d 1307, 1312 (11th Cir. 2016).  Here there was no such discrepancy.

### 2.     The Additional 75 Transactions the Government Relies Upon Are Not "Relevant Conduct" and Resulted in No Loss.

Not satisfied with the $73,018 in "loss" on Count 4, the government also seeks to include, as relevant conduct under § 1B1.3(a)(2), 75 additional instances of acquitted or uncharged conduct.  Adding these additional transactions to the mix inflates the alleged loss to $6.3 million—***more than 86 times*** the alleged loss on the only count the government won at trial. Notably, this is the identical loss amount the government calculated in advance of the last sentencing when Mr. Litvak had been convicted of 15 counts, rather than 1.  The government supports this extreme position by asking the Court to include in its loss calculation (1) the alleged loss on the 9 trades for which the jury concluded that the misstatements at issue were

immaterial to the transaction[6]; (2) 11 uncharged trades discussed at trial; and (3) 55 additional uncharged trades on which the government introduced no evidence at trial.

The Court should reject the government's effort to compensate for its failure of proof at trial by relying on acquitted and uncharged conduct.

### a.        The Court Should Not Consider Acquitted Conduct.

The government seeks a sentencing enhancement on the basis of $1.165 million in purported loss attributable to the 9 counts it lost at trial.  Jurists of all stripes have criticized the use of acquitted conduct at sentencing as "repugnant to [constitutional] jurisprudence."  *United States v. Watts*, 519 U.S. 148, 170 (1997) (Stevens, J., dissenting).[7]  Mr. Litvak objects to any acquitted-conduct-related enhancement on this basis.  The defense acknowledges that, under existing precedent, courts are allowed—though certainly not required—to consider acquitted conduct at sentencing.  *United States v. Vaughn*, 430 F.3d 518, 525-27 (2d Cir. 2005).  But the fact the jury in this case rejected the government's theory of materiality on 9 of 10 counts remains highly relevant.  The Second Circuit has stated quite clearly that sentencing courts

---

[6] Although the defense maintains that the government's case was deficient on 3 of the 4 elements of securities fraud, it defended the case before the jury only on the element of materiality.  The jury's verdict thus is reasonably interpreted as having rested on a finding that the misstatements at issue in the nine acquitted counts were immaterial.

[7] *See also Jones v. United States*, 135 S. Ct. 8, 9 (2014) (Scalia, J., dissenting from denial of certiorari) ("We should grant certiorari to put an end to the unbroken string of cases disregarding the Sixth Amendment" in a case where "not only did no jury convict these defendants of the offense the sentencing judge thought them guilty of, but a jury *acquitted* them of that offense."); *United States v. Baylor*, 97 F.3d 542, 549 & n.2 (D.C. Cir. 1996) (Wald, J., concurring) ("Despite the near unanimity of the circuit holdings, many individual judges have expressed in concurrences and dissents, the strongest concerns, bordering on outrage, about the compatibility of such a practice with the basic principles underlying our system of criminal justice." (collecting cases)); *United States v. Frias*, 39 F.3d 391, 392-94 (2d Cir. 1994) (Oaks, J., concurring) ("This is jurisprudence reminiscent of *Alice in Wonderland*. As the Queen of Hearts might say, 'Acquittal first, sentence afterwards.'"); *United States v. Concepcion*, 983 F.2d 369, 395-96 (2d Cir. 1992) (Newman, J., dissenting from the denial of a request for rehearing in banc) ("In some way, the law must be modified.  A just system of criminal sentencing cannot fail to distinguish between an allegation of conduct resulting in conviction and an allegation of conduct resulting in an acquittal.").

"***should consider the jury's acquittal*** when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence." *Id.* at 527.

Consistent with this instruction, District Courts have refused to consider acquitted conduct where, as here, the government seeks to use it to compensate for "a largely unsuccessful prosecution." *See* Sentencing Order at 2, *United States v. Buffis*, No. 3:13-cr-30028 (D. Mass. Apr. 20, 2016), D.E. 258 (declining to sentence based on acquitted conduct after a "largely unsuccessful prosecution" in which the government lost on 10 of 11 counts); *United States v. Coleman*, 370 F. Supp. 2d 661, 671-73 (S.D. Ohio 2005) (same where most of the convictions were on lesser included offenses). Allowing acquitted conduct to drive the sentence upward under these circumstances "trivializes 'legal guilt' or 'legal innocence' – which is what a jury decides." *United States v. Pimental*, 367 F. Supp. 2d 143, 147 (D. Mass 2005).

The case for disregarding acquitted conduct is doubly strong here because the acquitted counts did not involve "facts enhancing the crime of conviction, like presence of a gun or the vulnerability of a victim," but rather entirely "different [alleged] crimes, each in a different count." *Pimental*, 367 F. Supp. 2d at 153. The 9 acquitted counts each arose from a distinct transaction. The Court properly instructed the jury that whether the misstatement at issue in each transaction was material "is a very fact-specific inquiry" which must be undertaken on a case-by-case basis. Jury Instr. No. 35. Yet the government asserts that, rather than undertake the "fact-specific inquiry" it instructed the jury to do, the Court simply should assume that "every one" of the trades at issue here "fits the same pattern" and caused a loss. *See* PSR ¶ 22. The Court should reject this invitation. Its instruction to the jury on the fact-specific nature of materiality was correct not only as a matter of law but of logic as well.

Even if the Court were inclined undertake a *de novo* "fact-specific inquiry" on each of the acquitted counts, it should reach the same conclusion as the jury: the evidence was insufficient to show that the misstatements were material. Accordingly, (1) the misstatements at issue in the other counts cannot be deemed "relevant" conduct for purposes of U.S.S.G. § 1B1.3(a)(2)[8]; and (2) the misstatements cannot be deemed to have caused loss (because an immaterial statement is incapable of causing fraud loss).

As to three of the charged counts (Counts 3, 5, and 6), the government failed to call the person who made the decision to execute the trade at issue.[9] Several of the witnesses who were called to testify about other counts had no independent recollections of the trade at issue[10]; the jury rightly acquitted on each of those counts as well.

The testimony that was given at trial thoroughly eviscerated the government's theory that a lie in RMBS negotiations is material *per se*. The fact witnesses the government called on Counts 1 through 3 and 8 through 11 explained the rigorous investment processes they used to value bonds before purchasing them. They emphasized that investment decisions in this market are dominated by the investor's internal analytics, not by unverified information volunteered by counterparties in negotiations.[11] These investors also testified that the prices they negotiated

---

[8] Relevant conduct under U.S.S.G. § 1B1.3(a)(2) is conduct "with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." "The burden is on the government to prove the elements of the purported relevant conduct by a preponderance of the evidence." *United States v. Washington*, 38 F. Supp. 2d 21, 24 (D.D.C. 1999); *see United States v. Ahmad*, 202 F.3d 588, 591 (2d Cir. 2000) (conduct only falls under § 3D1.2(d) if it constitutes a federal crime).

[9] Count 3 involved transaction negotiated between Mr. Litvak and Robert Schick of AllianceBernstein, who was not called as a witness. Count 5 involved a transaction negotiated between Mr. Litvak and Al Vlajinac of Wellington Management Company, who was not called as a witness. Count 6 involved a transaction negotiated between Mr. Litvak and Alvin Sarabanchong of MFA Financial, who was not called as a witness.

[10] Tr. 397:15-18, 398:1-2 (Canter, Counts 1-2); 533:6-8 (Corso, Count 8); 932:10-20, 936:4-10 (Wollman, Counts 9-10); Tr. 704:23-705:7 (Lemin, Count 11).

[11] *See* Tr. 325:14-16 (Canter) ("Q. Internal analytics play a fundamental role in your decision about what price to pay? A. Yes."), Tr. 411:18-412:3 (Canter) (importance of being cautious about unverified information); 514:23-

with Mr. Litvak were consistent with their internal analytics and independent judgment.[12]  Three

of them testified that, even after learning the government's allegations against Mr. Litvak, they

still would have purchased the same bond again at the same price.[13]  And, according to the

testimony of the industry expert, Phillip Burnaman, this made sense:  RMBS investors do not

rely on unverified statements of the kind at issue here; their investment decisions turn on internal

analytics and independent judgment.  Tr. 1230:23-1231:13, 1240:16-1241:11.

In short, the 9 acquittals flowed directly from the evidence and rightly reflected the fact-

specific nature of materiality in the Section 10(b) context.  This jury "explicitly did not authorize

sentencing" pursuant to Counts 1 through 3 and 5 through 11.  *Coleman*, 370 F. Supp. 2d at 672-

73.  The Court should "neither marginalize that finding nor allow the government another

opportunity to make a failed case."  *Id.*

---

515:8 (Corso) (testifying that York tries to rely on verifiable information and to double check its work); 728:5-729:22 (Lemin) (testifying that the models are "part of the expertise investors pay Magnetar to apply" in the "complicated" investment process and that he takes isolated pieces of information "with a grain of salt"); 927:16-930:7 (Wollman) (describing model), 930:12-16 (Wollman) (model is "definitely one of the main components" in determining the price to pay for a bond), 949:25-951:2 (Wollman) (skepticism in the market).

[12] *See* Tr. 407:2-8 (Canter) ("Q.  The total price that you paid on all three of these bonds was consistent with what your independent judgment told you was a good price? A. Yes.  Q.  And consistent with what your internal pricing analysis had told you was a good price? A. Good and met our yield bogey."); 540:15-20 (Corso) ("Q. And the price of 61 was consistent with what the internal analytics were telling you was a good price? A. Yes. Q. Consistent with what your curves were telling you was a good price? A. Yes."); 986:1-11 (Wollman) ("Q. The question is, the LXS bond that you bought from Jefferies, the total price that you paid was consistent with what your internal analytics told you was a good price for the bond? A. Yes.  Q. And with respect to the CWALT bond, the March 30, 2010 transaction, the total price that you paid was a price that your internal analytics told you was a good price for the bond? Same question.  A. It is a price – it is a price that I was comfortable buying the bond at.").

[13] *See* Tr. 411:18-20 (Canter) ("Q. Sitting here today looking back, solely in terms [of] price, you would buy all three of these bonds at the same total price that you paid then? A. Yes."); 542:23-543:1 (Corso) ("Q. And I take it that if Jesse had said I have a place in my inventory for this bond and I will buy it from you at 61 and that's my bottom line, you would have sold it? A. Yes."); 706:17-21 (Lemin) ("Q. In the FHAMS trade, for example, that you talked about yesterday, if Jesse had not talked to you about acquisition cost, you may well still have bought that bond? A. I may well could have bought that bond.  Q. You may well still have bought it at the same total price that you bought it at? A. I could have.").

**b.      The Government Has Not Proven Materiality or Loss on the Uncharged Trades.**

The remaining $5 million of "loss" is attributable to 66 uncharged transactions.  On these the government quite frankly has mailed it in.  Aside from Bloomberg chats and trade tickets, with respect to the large majority of these transactions the government offers no evidence about what populated the "total mix" of information relevant to the investment decision.[14]  As the Court knows, much of the trial was taken up by a discussion of what information is included in the "total mix," and it showed that the character of the "mix" is transaction-specific.[15]  Thus, without evidence about (1) what constitutes the "total mix" of information available to an investor and (2) the weight of Mr. Litvak's statements relative to that "total mix," it is impossible to tell whether they were material and hence capable of causing loss.  *See* Jury Instr. No. 35.

For these reasons and those explained in detail below, the government has failed to prove, by a preponderance of the evidence, that any of the 66 uncharged transactions constitutes "relevant conduct" under § 1B1.3 or that they caused loss.[16]

*1. Transactions involving the same counterparty as a trade in an acquitted count.*

Twenty-six of the transactions (including the 9 acquitted counts) were between Jefferies and an investor who was a counterparty to an acquitted count.  The total alleged loss associated with

---

[14] At trial, the government presented testimony from a counterparty-witness for 8 of the uncharged transactions.

[15] For example, there was testimony and evidence at trial that (1) a company's internal modeling was at least a main consideration in a transaction, *see, e.g.*, Tr. 325:14-16 (Canter); 728:5-729:22 (Lemin); 927:16-930:17 (Wollman); (2) companies had access to and sometimes received price information from a large number of broker-dealers, *see, e.g.*, Tr. 372:11-374:22 (Canter); and (3) companies that already owned a bond held the bond at a particular mark provided by an independent third party, *see, e.g.*, Tr. 371:3-372:4 (Canter); Tr. 512:14-514:3 (Corso).  Testimony also established that different factors might have a different weight depending on the particular transaction.  *See, e.g.*, Tr. 636:9-11, 703:25-704:22 (Lemin).  The government's proffer includes no evidence about any of these factors for the vast majority of the trades.

[16] Attached as Exhibit B to this Memo is a chart identifying the various points that apply to each of the trades on the loss chart the government provided to Probation.

these transactions is $2,013,518.29.  *See* Gov't Loss Binder, Tabs 9, 12, 16, 17, 18, 20, 23, 27, 28, 29, 30, 31, 34, 44, 48, 50, 51, 54, 57, 59, 63, 64, 71, 72, 73, 74.  If there was insufficient evidence that these investors found misstatements in the indictment to be material—as the jury found—there is no reason to believe that those same investors would have placed greater weight on the same kinds of statements in different transactions.  The government provides no additional evidence about these uncharged trades that would allow the Court to reach a different conclusion.

*2. Transactions with no witness testimony to support "loss."*  For well over half of the trades in its proposed loss chart, the government did not speak with the relevant counterparty witness about the particular trade:

- For 27 transactions with an alleged $2,660,500.31 in loss, the government did not interview *anyone* from the counterparty investment fund.  *See* Tabs 1-6, 8, 13, 19, 21, 22, 24, 36, 46, 47, 49, 52, 56, 60, 61, 62, 65, 67, 68, 69, 75, 76.

- For 19 transactions with an alleged loss of $1,594,833.45, the government interviewed someone from the counterparty investment fund but either did not speak with the person who actually negotiated the transaction, *see* Tabs 7, 15, 23, 26, 35, 38, 39, 48, 57, 58, or spoke with that person but asked no questions about the trade at issue, *see* Tabs 11, 17, 20, 37, 40, 55, 66, 70, 72.

*3. Trades for which the government's interviews with investors affirmatively undermine its "loss" theory.*  It is understandable why the government did not ask investors about many of the transactions in this category—when it did so, the answers it received often sounded like they could have been given by the defense expert, Mr. Burnaman.  For example:

- **Angelo Gordon** was the counterparty to 5 of the transactions included on the government's loss chart.  *See* Tabs 25, 33, 40, 41, 53.  The government interviewed Angelo Gordon traders Thomas Durkin and Adam Henick.  Mr. Durkin said Angelo Gordon relies on its highly sophisticated proprietary modeling when making investment decisions, that statements of the kind at issue do not influence those decisions, and that while Mr. Litvak's lies angered him "on a conceptual basis," they did "***not on an economic basis***."  *See* Ex. C (11/13/2012 MOIA re: Thomas Durkin Interview) at 3.  Mr. Henick noted that "he 'wouldn't lose sleep' if he found out" about lies about bond ownership, and "explained that 'we do the trade because we like the future value of the bond' rather than rely on representations furnished by brokers."  *See* Ex. D (11/13 2012 MOIA re: Adam Henick Interview) at 2.

- **Blackrock** was the counterparty to 3 of the transactions included on the government's loss chart.  *See* Tabs 7, 26, 32.  The government interviewed Blackrock bond trader Florin Teleanu.  Mr. Teleanu told the government he did not have a specific recollection of the only trade he was asked about, the trade at Tab 32.  He told the government that he would "rather" a dealer not lie, but that he would still buy bonds from a trader who lied "if he sees value in them at a particular price."  Mr. Teleanu further said that any misstatements from Mr. Litvak merely "could have" influenced the buying decision or the price paid but could not say that they actually did.  *See* Ex. E (11/30/2012 MOIA re: Florin Teleanu Interview) at 3.

- **Red Top** was the counterparty to 2 of the transactions included on the government's loss chart.  *See* Tabs 11, 14.  The government interviewed Peter McMullin of Red Top, but did not ask about the bond at Tab 11.  With respect to the bond at Tab 14, Mr. McMullin

told the government it was "hard to say" if it would have mattered to him to have known that the bond was in Jefferies' inventory; that he could not say the outcome of the trade would have been different if he had known there was a different purchase price; and that his independent judgment drove his decision. *See* Ex. F (2/12/2014 MOIA re: McMullin Witness Prep Session) at 1.

- **Third Point** was the counterparty to 1 transaction included on the government's loss chart. *See* Tab 10. The government interviewed Keri Findley, who negotiated the transaction with Mr. Litvak. Ms. Findley noted that she "believes she is often not told the truth" in negotiations; that despite the alleged lie, she still thought the Tab 10 trade was a good trade; that she "***cannot say for certain*** she would have made more money" if Mr. Litvak had been truthful; and that "[k]nowing that Litvak lied to her ***would not preclude Findley from doing future trades with him***" if the price was right. *See* Ex. G (10/11/2013 MOIA re: Findley Interview) at 3.

- **WAMCO** was the counterparty to three of the transactions included on the government's loss chart. *See* Tabs 37, 39, 43. The witnesses the government spoke to—Gregory Handler and Ben Hunsaker—explained that investors in this market are inherently skeptical of information they learn from counterparties in negotiations and therefore assume that misrepresentations occur every day. *See* Ex. H (10/25/2012 MOIA re: Handler Interview) at 5 ("When asked if it was okay for a broker to lie to the seller of a bond, Handler responded that ***the policy of 'caveat emptor' (buyer beware) applies in the bond market***."); Ex. I (10/25/2012 MOIA re: Hunsaker Interview) at 2 ("Hunsaker stated that in general, he ***'would not be surprised in the least' if a broker lied about his***

*acquisition price*.  He assumes that this type of misrepresentation occurs 'every day.'").
Neither had a specific recollection of any of the trades at issue.

   *4. Transactions in which the counterparty bid the same (or higher) prior to the alleged misstatement.*  For 7 transactions with an alleged loss of $938,895.42, the counterparty bid at or above the final price *prior to* the alleged lie by Mr. Litvak.  *See* Tabs 21, 41, 42, 45, 46, 53, 62.  For example, in connection with the June 24, 2010 FHASI 2007-AR1 1A1 trade with Invesco, Brian Norris—repeating the same pattern as the Count 4 trade—indicated to Mr. Litvak that Invesco would bid "80" for the bond prior to any misrepresentation by Mr. Litvak; in fact, that exact price is what Invesco paid.  *See* Tab 42 & GX 442D.  The negotiations over the other 6 trades in this category fit the same pattern.  In each of these transactions, the buyer effectively set a floor on the price it would pay *before* any misstatements were made.  The misstatements therefore were immaterial and incapable of causing any "loss."

   *5. Transactions for which the government has not proven a misstatement.*  As the Court knows, the defense never has said Mr. Litvak always told the truth in RMBS negotiations.  But that does not relieve the government from its burden to prove that the statements at issue in the supposed "relevant conduct" trades were in fact false.  *See Washington*, 38 F. Supp. 2d at 24 (in order for conduct to be considered "relevant" the government must prove all elements of the offense).  As to at least two of the trades (totaling $117,576.50 in loss), the evidence the

government has submitted is insufficient to prove falsity.  *See* Tabs 2,[17] 6.[18]  That it would use these transactions to inflate the Guidelines range illustrates the degree to which the government has overreached and should undermine the Court's confidence in the entirety of its threadbare "relevant" conduct presentation.

### 3.    There Should Be No § 2B1.1(b)(2)(A)(i) Enhancement.

The PSR applies a 2-level increase for conduct involving more than 10 victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).  Application Note 1 defines "victim" as any individual or entity "who sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. § 2B1.1 cmt. n.1.  Because the government has not proven any actual loss by a preponderance of the evidence, there are no "victims" for purposes of § 2B1.1(b)(2)(A)(i).

### 4.    The Court Should Depart from the Guidelines if it Adopts the Government's View of Relevant Conduct and Loss.

For the reasons given, the government has failed to prove any "relevant" conduct or any loss by a preponderance of the evidence.  But in the event the Court disagrees, a downward departure is in order because the 20-level increase proposed in the PSR (18 levels for loss and 2 for the number of victims) "substantially overstates the seriousness of the offense."  *See* U.S.S.G. § 2B1.1, cmt. n. 20(C).

---

[17] In the trade included at Tab 2 (between Jefferies and Dwight Asset Management), the government doesn't include sufficient documentation to show that Mr. Litvak's statement is a misrepresentation.  The government implies that a statement Mr. Litvak made at one point in the negotiations (2:05PM on Feb. 23, 2009)—"42 best is all i gots . . . will work for 2/32s" —is false, presumably because the trade ticket shows that Mr. Litvak sold the bond at 2:22PM at a price of 43-24.  But the government includes no evidence regarding the negotiations on the other side of the trade, or any further communications that might have occurred during the 10 minutes that passed between the last interaction with Dwight and the trade ticket recording the sale of the bond to WAMCO.  Nor has the government provided evidence to indicate what role, if any, "42 best is all i gots" played in Dwight's investment decision.

[18] In the trade included at Tab 6, Mr. Litvak told his counterparty, Kore Advisors LP, that it could own the bond in question at a price of 24, and that Jefferies could purchase the bond "a c[ou]ple ticks cheap to that."  The trade ticket indicates that Jefferies acquired the bond at a price of 22-16, but there's no indication that Mr. Litvak ever made a precise representation about Jefferies' acquisition price, much less that the vague representation he did make played any meaningful role in Kore Advisors' investment decision.

This case falls well outside the "heartland" of fraud targeted in § 2B1.1.  *See* U.S.S.G. ch. 1, pt. A § 4(b).  Even if there was some "loss" associated with Mr. Litvak's conduct, it was a "loss" of a particularly subtle and theoretical variety that can only be described as atypical for Guidelines purposes.  *See United States v. Prosperi*, 686 F.3d 32, 44 (1st Cir. 2012) (affirming district court's "refusal to allow the loss estimate to control its sentencing determination" based on evidence "that the finished product met project specifications" even if the defendants had used construction materials of a less-than-agreed-upon quality).  This is especially true as to the Count 4 trade in which Invesco ended up purchasing the bond at an all-in price Mr. Norris expected to pay at the outset of the negotiations.  Mr. Norris confirmed that Mr. Litvak "had no role in creating" Invesco's opening bid.  Tr. 764:24-765:16.  Mr. Norris started the negotiations willing to pay 79-30 because he thought it was attractive based on Invesco's internal analytics; in fact, it was well ***below*** Invesco's true reserve price of 80.  DX 2079.

The character of the misstatements themselves takes this case even further outside the "heartland."  What Mr. Litvak conveyed about Jefferies' profits hardly was indispensable information.  He had no obligation to disclose it, and several investors testified at trial that they often lack this information when they trade with dealers.  *See* Tr. 314:8-13 (Canter), 706:8-12 (Lemin).  There is no dispute that the "total mix" of information relevant to investment decisions in this market is dominated by other factors.  Moreover, several of the investors who testified at trial said they treated information of the kind Mr. Litvak misstated "with a grain of salt," *see* Tr. 729:20-22 (Lemin), because any reasonable investor knows "the level of BS in this market runs high," Tr. 439:2-10 (Canter).[19]  In short, "the fraud was not mainstream fraud" and thus resides

---

[19] *See also* Tr. 411:22-412:24 (Canter "knew that there were negotiating tactics in the market that shaded the truth," and so was "especially careful" when weighing unverified information, which makes "perfect sense for a reasonable investor" like AllianceBernstein); 514:23-515:5 (Corso) ("Q. In fact, in all the decisions that you make at York, you want to make sure, to the best of your ability, that you are making the decisions on reliable information? A. Yes. Q.

well outside the heartland.  *United States v. Broderson*, 67 F.3d 452, 459 (2d Cir. 1995)

(misstatement about costs in government contracting case was outside the heartland because

"negotiators usually need not reveal their costs to the other side"); *see also United States v.*

*Forchette*, 220 F. Supp. 2d 914, 925 (E.D. Wis. 2002) (recognizing that a departure may be

warranted if the "representation may have been of limited materiality"); *United States v. Morris*,

80 F.3d 1151, 1174 (7th Cir. 1996) (same).

Finally, the government's loss amount is vastly disproportionate to any personal gain

Mr. Litvak received as a result of the misstatements.  The "heartland" is populated by "case[s]

where loss and gain are roughly coincident."  *United States v. Costello*, 16 F. Supp. 2d 36, 39 (D.

Mass. 1998).  Departures are warranted where there is a large disparity between loss and gain.

*Id.* (basing departure on the great disparity between a "$20,000,000 loss figure" and a gain of, at

most, $120,000).[20]   That is the case here.  Any incremental profit generated as a result of the

misstatements went to Jefferies, not Mr. Litvak (it was for this reason that the Court ruled the

government could not argue that Jefferies' profits were "Litvak's profits," *see* D.E. 432 at 16).

Even the government concedes that, at most, Mr. Litvak received (indirectly) only a fraction of

that amount as part of his year-end bonus.  *See* 2014 Trial Tr. 1933:12-17 (Eveland Test.)

("There's no rule of thumb" regarding the bonus); PSR ¶ 19 (noting government's argument that

---

You try to double check your work? A. Yes.  Q. And verify what you are doing? Yes."); 735:20-22, 736:7-15
(Lemin has "a level of skepticism" in negotiations and "there was a general perception in the market" that "some
information" in the market "could be less than truthful"); 793:1-16 (Norris agrees that investors have to be "wary"
of "volunteered information" and that is one of the reasons why they do their own analysis); 950:25-951:2
(Wollman) ("Q. You're on guard when you hear volunteered information from a counterparty negotiating against
you? A. Negotiating against me, yes.").  *See also* DX 1215 (Wollman tells another dealer to "believe as much of that
as you will" regarding pricing information from Mr. Litvak).

[20] *See also Forchette*, 220 F. Supp. 2d at 925 (departing in part because of the "gross disparity" between the gain of
at most $54,000 and the loss of $464,300); *United States v. Oakford Corp.*, 79 F. Supp. 2d 357, 368 (S.D.N.Y. 1999)
(departing in part because "each of the defendants personally realized only a small portion of the overall gain or
profits of $15 million").

Mr. Litvak could expect 5-12% of his book's profits as a bonus).  This vast difference between gain and loss is an independent and compelling grounds for departure.

> **D.     A Sentence of Home Confinement Is Reasonable and Appropriate Under the 18 U.S.C. § 3553(a) Factors.**

The Court's ultimate task is to identify a reasonable sentence that is sufficient but no greater than necessary to promote respect for the law, adequately punish the crime, and deter others.  *See* 18 U.S.C. § 3553(a).  A sentence of 8 months of home confinement and a fine of $250,000 is more than adequate to achieve those goals.

> **1.     Section 3553(a)(1): A Sentence of Home Confinement Fits the Offense and the History and Characteristics of Jesse Litvak.**

> **a.     Personal History and Characteristics**

Mr. Litvak's personal history and characteristics strongly support a sentence well below the PSR's Guidelines range, as well as below the Court's 2014 sentence.  As noted, over 100 people have written this Court on two separate occasions to describe the positive ways in which Jesse Litvak has touched the lives of family and friends from his childhood to the present.  *See* Part II, *supra*; Ex. A.  These letters do not change the facts of this case, but they indicate there is much more to Jesse than what the Court heard about him from the government at trial.



████████████████████████████████████████████████

█████████████████████████████

Circumstances such as these are a well-recognized factor in sentencing, and, when viewed in light of the differences in the sentencing record between now and in 2014, counsel in favor of home confinement, rather than imprisonment.[22]

### b.      Nature and Circumstances of the Offense

### 1)      Market Context

A sentence to home confinement is reasonable in light of the seriousness of the offense. 18 U.S.C. § 3553(a)(1).  Mr. Litvak did not take advantage of vulnerable investors or misrepresent the nature or price of the bonds he was trading.  As the Court heard throughout the trial, the RMBS market was dominated by highly sophisticated Qualified Institutional Buyers ("QIBs") transacting with dealers on a principal-to-principal basis where the profit motives of each side were well understood.  Their investment decisions were driven not by volunteered information from a single dealer but by complex proprietary models, independent pricing services, and the investor's own expertise and judgment about the market.  The evidence showed that these well-heeled investors did not expect absolute candor from dealers like Mr. Litvak—in fact, the lies in these negotiations went in both directions.  And, while the investors who testified at trial said, unsurprisingly, that they would have preferred to pay less rather than more, none

---

[21] The government acknowledged ██████████████████████████████ but argued that Jesse's in-laws were a source of "substitute care."  D.E. 260 at 16.  In light of the family's move to Florida, that "substitute care" is no longer available.

[22] *See, e.g.*, *United States v. Mullings*, 131 F. Supp. 3d 1, 4 (E.D.N.Y. 2014) (non-custodial sentence appropriate where custodial sentence would "cause hardship to [defendant's] wife and three young children who all depend on him"); *Adelson*, 441 F. Supp. 2d at 513 (premising downward variance, in part, on letters from "persons from all walks of life . . .  attesting, from personal knowledge, to [defendant's] good works and deep humanity," his "generosity of spirit," and his "good deeds . . . not performed to gain status or enhance his image").

complained about the bonds Mr. Litvak sold them or how they performed.  To the contrary, these investors confirmed they bought or sold the bonds at issue at prices they believed were attractive based on their independent judgment.[23]  History would prove them right.  Invesco made over $3.8 million, or a 12% return, on its investment in the Count 4 bond; the investors' yield on other trades was even higher.  *See* D.E. 160-1 (Dec. 24, 2013 Letter from Smith to Francis at 8 & Ex. D (Expert Disclosure re: R. Willner)).  These facts, in themselves, are not dispositive on the issues of materiality and loss.  But they remain relevant to the Court's assessment of the seriousness of the offense.

### 2) The Government's Handling of Comparable Cases

The government's handling of other cases arising out of its industry-wide investigation of RMBS trading practices says much about the seriousness of the offense, and undermines any argument that imprisonment is the Court's only option here.  At this point, the investigation has lasted the better part of a decade, and it has revealed that the negotiating tactics at issue in this case were widespread.  There are outstanding indictments in two other cases, and the government entered into plea agreements with two former Royal Bank of Scotland traders and one former Nomura trader.  But the government has treated other cases where it uncovered evidence of lies in RMBS negotiations as regulatory, rather than criminal matters—most notably in the cases of

---

[23] *See* Tr. 407:2-8 (Canter) ("Q.  The total price that you paid on all three of these bonds was consistent with what your independent judgment told you was a good price? A. Yes.  Q.  And consistent with what your internal pricing analysis had told you was a good price? A. Good and met our yield bogey."); 540:15-20 (Corso) ("Q. And the price of 61 was consistent with what the internal analytics were telling you was a good price? A. Yes.  Q. Consistent with what your curves were telling you was a good price? A. Yes."); 789:2-5 (Norris) ("Q. The price that you paid Jefferies for the SARM bond was consistent with what your personal judgment was telling you was a good price for that bond? A. On that day, yes."); 986:1-11 (Wollman) ("Q. The question is, the LXS bond that you bought from Jefferies, the total price that you paid was consistent with what your internal analytics told you was a good price for that bond?  A. Yes.  Q. And with respect to the CWALT bond, the March 30, 2010 transaction, the total price that you paid was a price that your internal analytics told you was a good price for the bond?  Same question.  A. It is a price – it is a price that I was comfortable buying the bond at.").

Goldman Sach's Edwin Chin, Morgan Stanley's Nicholas Bonacci, and two other Jefferies traders.

To be clear, the defense is not arguing for leniency because the U.S. Attorney's office "singled out" Mr. Litvak.  But the fact that the government—indeed, this very U.S. Attorney's office—has concluded that similar conduct merited only regulatory, not criminal, sanctions remains highly relevant to the Court's assessment of the seriousness of the offense and the appropriate punishment:

*Edwin Chin*, a trader at Goldman Sachs, agreed not to contest the SEC's finding that he "misled Goldman's customers with whom he was negotiating the sale of RMBS about the price at which Goldman had bought the RMBS and the amount of Goldman's compensation for arranging the trades.  In certain circumstances, Chin also misrepresented that he was arranging a[n] RMBS trade between customers, when Chin really was selling the RMBS out of Goldman's own inventory."  *See* Ex. J (*In re Chin*, SEC Admin. Proceeding No. 3-17394, Order Instituting Administrative and Cease-and-Desist Proceedings, at 2 (Aug. 16, 2016)).  His matter was resolved via an SEC administrative order imposing a $400,000 fine and 2-year employment bar.

*Nicholas Bonacci*, a trader at Morgan Stanley, agreed not to contest findings that he "misled Morgan Stanley's customers with whom he was negotiating the sale of RMBS about the price at which Morgan Stanley had bought the RMBS and the amount of Morgan Stanley's compensation for arranging the trades.  In certain circumstances, Bonacci also misrepresented that he was arranging a[n] RMBS trade between customers, when Bonacci really was selling the RMBS out of Morgan Stanley's own inventory."  Ex. K (*In re Bonacci*, SEC Admin. Proceeding No. 3-17575, Order Instituting Administrative and Cease-and-Desist Proceedings, at 2 (Sept. 26,

2016)).  His matter was resolved with an SEC administrative order imposing a $100,000

administrative fine and a 12-month employment bar.

The divergent tacks the government took in this case and in the *Chin* and *Bonacci* matters

cannot be explained by any difference in the "loss" amounts.  The "loss" attributed to the trades

referenced in the SEC's order in the Chin case (*i.e.*, the incremental profit Goldman allegedly

made as a result of Mr. Chin's misrepresentations) is ***higher*** than the amount the government

attributes to the charged trades here—$1,516,859 to $1,238,340.85.  The "loss" amount

attributed to the trades referenced in the SEC's order in the *Bonacci* matter is only slightly lower

($919,607), but still more than twelve times the $73,018 in "loss" associated with Count 4.

***Kevin Blaney*** was a Managing Director at Jefferies.  FINRA found that Mr. Blaney

"misrepresented to JEFF customers either the price at which JEFF acquired, or was able to

acquire, bonds that the customers were interested in purchasing, or that JEFF was working with a

seller of bonds when JEFF already owned the bonds in inventory."[24]  It imposed a $30,000 fine

and suspended him from the industry for 3 months.  The government pursued no civil or criminal

charges.

***William Jennings*** was Mr. Litvak's supervisor at Jefferies.  Evidence introduced at trial

showed that Mr. Jennings was an enthusiastic participant in the conduct the government alleged

was criminal in this case.  Though it filed no charges against him, the government apparently

concluded that Mr. Jennings engaged in criminal conduct:  In addition to referencing

Mr. Jennings in the Indictment (as "Supervisor #1"), the government told the Court in November

of 2016 that "Jennings had worked with Litvak to defraud AllianceBernstein" and the

government insisted that Mr. Jennings resign from Jefferies before it would enter into a non-

---

[24] *See* Ex. L (FINRA Letter of Acceptance, Waiver and Consent No. 20160499622-01, at 2 (Aug. 26, 2016)).

prosecution agreement with the company because in the government's view "it would be impossible to reform Jefferies' culture if Jennings continued as its co-Head of Fixed Income."[25] FINRA suspended Mr. Jennings from the industry for 3 months and imposed a $30,000 fine.[26] But that was more than offset by the $10 million exit payment he received upon his forced resignation from Jefferies.

*          *          *

Prosecutors have discretion over what charges to bring and against whom.  But the fact that the government decided that fines and industry sanctions were sufficient punishment for Messrs. Chin, Bonacci, Blaney, and Jennings greatly undermines the case for imprisonment in this case.

### c. A Sentence in the Government's Guidelines Range Does Not Reflect the Nature and Character of the Offense.

At the 2014 sentencing, the Court concluded the Guidelines were "very unhelpful" in this case because the loss table "effectively overwhelm[s] the guideline analysis," *see* July 23, 2014 Hr'g Tr. at 141:20-142:1.  That would be even more true today than in 2014, should the Court accept the government's inflated loss calculation.  The government's total loss calculation is ***more than 86 times*** the loss it attributes to Count 4.  This triples the offense level and results in a range of 9 to 11 years.  A sentence in this range simply does not accurately and fairly reflect the nature of the single offense of which Mr. Litvak was convicted.  Therefore, to the extent the

---

[25] Gov't Opp. to Defendant's Motion to Compel Disclosure of Communications Regarding William Jennings' Separation from Jefferies at 2, 3, *United States v. Litvak*, No. 3:13CR19 (JCH) (D. Conn. Nov. 18, 2016) (D.E. 453).

[26] *See* Ex. M (FINRA Letter of Acceptance, Waiver and Consent No. 20160486934-01, at 2 (April 2, 2016)).

Court accepts the government's calculations, it should impose a sentence well below the Guidelines range, as it did in 2014.[27]

Even setting aside the unique disparity between what actually was proven at trial in this case and the government's inflated "loss" total, there are good reasons for the Court to give very little weight to the Guidelines calculation (again, to the extent it accepts the government's loss amount). The fraud provisions of the Guidelines have been described as "patently absurd on their face,"[28] "a black stain on common sense,"[29] and "of no help" in identifying a sentence that passes muster under § 3553(a).[30] From their inception the fraud provisions of the Guidelines substantially departed from the benchmark Congress directed the Commission to use as a starting point—the average sentences imposed and prison time actually served before the relevant guideline was adopted. 28 U.S.C. § 994(m); *see* Frank O. Bowman, Comment on Proposed Amendments to the Economic Crime Guideline, § 2B1.1, at 3-4 (Feb. 19, 2015). Subsequent amendments, passed "without the benefit of empirical study," exacerbated this problem. *United States v. Corsey*, 723 F.3d 366, 379-80 (2d Cir. 2013) (Underhill, J., concurring) ("The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb."). It therefore is no surprise that, in 2014 and 2015, in nearly 70% of cases in which the primary offense was fraud, defendants in the Second Circuit were sentenced below the Guidelines range. *See* U.S. Sentencing Comm'n, Statistical Information

---

[27] The Court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses. *Cavera*, 550 F.3d at 191.

[28] *Adelson*, 441 F. Supp. 2d at 512 (Rakoff, J.).

[29] *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.).

[30] *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) (Gertner, J.).

Packet, Fiscal Year 2014 (Second Circuit) at 18; U.S. Sentencing Comm'n, Statistical

Information Packet, Fiscal Year 2015 (Second Circuit) at 18.

> **2.      Section 3553(a)(2): A Sentence of Home Confinement is Consistent with the Objectives of Sentencing.**

A sentence of home confinement and a $250,000 fine is more than sufficient to advance

the sentencing objectives outlined in 18 U.S.C. § 3553(a)(2).

> **a.      Deterrence**

As the Court recognized at Mr. Litvak's first sentencing, Mr. Litvak has no criminal

history, and there is no reason to believe Mr. Litvak will commit any further crimes.  July 23,

2014 Hr'g Tr. at 147:6-25.  He has suffered enormously—and publicly—as a consequence of his

actions:  he lost his job and his career; he was the subject of a grand jury investigation; he was

indicted, arrested, tried, convicted, retried, and convicted a second time (though of only 1 count).

This process has taken 5 years, and it has played out in the white hot glare of the media spotlight.

That media attention continues to this day.[31]

Mr. Litvak has been under the supervision of U.S. Pretrial Services and Probation since

his January 2013 arrest and has been subject to regular check-ins, travel restrictions, restrictions

on contact with friends and former colleagues, and periodic drug testing.

As many of the letters submitted by Mr. Litvak's friends and family have noted, the

investigation and prosecution of this matter have deeply affected Mr. Litvak.  In connection with

his first sentencing, he faced the prospect of being absent for his young children's entire

childhood.  Even with him present, Mr. Litvak's family has suffered greatly—emotionally and

---

[31] The government has continued to publicize this case, issuing a press release hours after the jury's verdict.  Ex. N (Press Release, United States Attorney for the District of Connecticut, Former RMBS Trader Convicted of Securities Fraud After Retrial (Jan. 27, 2017)).

financially—and Mr. Litvak continues to live with the shame of the stress, fear, and hardship his actions have caused. Ex. A at 2 (Dr. R. Litvak Letter), 21 (B. Bendett Letter).

Moreover, at the age of just 42, Mr. Litvak will face collateral consequences from this ordeal for the rest of his life. One near-certain consequence of his conviction on Count 4 is a permanent bar from working in the industry by the SEC (such a bar was imposed after his 2014 conviction and lifted only after the appeal). Even if there were no official bar, the widespread negative publicity surrounding this case has eliminated any realistic chance Mr. Litvak could ever work in finance again. And the permanent record of this case on the internet will remain a substantial barrier to Mr. Litvak obtaining gainful employment in any sector.

The goal of general deterrence likewise has already been realized and would not be meaningfully advanced by a sentence of imprisonment. The government's indictment in this case sparked wide-spread changes in the "post-*Litvak*" era. The government's own investigation has revealed numerous changes in messaging, training, and understanding—all of which resulted from Mr. Litvak's highly publicized indictment.[32] Indeed, the facts of this case are often discussed in industry compliance trainings. *See* Ex. P (Robert Gearty & Chris Dolmetsch, *Nomura Warned Against Lying After Jefferies Trader Charged*, Bloomberg News (Apr. 6, 2016, 10:33 PM) (reporting on statements by government at hearing)). As the United States Attorney

---

[32] *See, e.g.*, Ex. O (DOJ-OTHER-003318, at -3321 ("A Litvak case study has been incorporated into Goldman's annual compliance training; there are several slides about the case in the presentation."); DOJ_OTHER-004083, at -4090 (after Litvak was indicted, discussed at a Morgan Stanley meeting that "some of their tactics may have been illegal" and traders were told "no more lying"); DOJ_OTHER-004411, at -4414-15 ("When Litvak was indicted," Cantor Fitzgerald "'probably up'd their code of conduct' communications with employees and instructed employees not to behave in the manner Litvak did"); DOJ_OTHER-004533, at -4538 (compliance team at Cantor did a "talk" in response to Litvak indictment); DOJ_OTHER-000246, at -248 (describing "increased scrutiny on client contacts at JP[ Morgan] after the Litvak charges came out"), -251 (describing pre-*Litvak* and post-*Litvak* JP Morgan policies regarding markup); DOJ_OTHER-002305, at -2315 (RBS trader said Litvak arrest "had a sobering effect on the industry. Everyone in the industry realized that in some ways that it could have been them that had been arrested."); DOJ_OTHER-001727,at -1727 (According to RBS trader, "[f]ollowing the arrest of Jesse Litvak, things have changed dramatically in the industry. Specifically, compliance is now heightened.")).

said her January 27, 2017 press release:  this case already has "acted as a forceful disincentive to market participants tempted to commit securities fraud."  Ex. N.

> **b.**    **The Government's Suggestion that Mr. Litvak Has Been Undeterred Is Baseless.**

The government argued in its submission to Probation that a single text message it uncovered in its investigation is proof that Mr. Litvak "shrugged off a 24-month sentence and $1.75 million fine, casting some doubt as to whether that sentence was sufficient to achieve specific deterrence" and "dilut[ing] any general deterrence achieved."  Letter from Francis to Welks at 8 (Feb. 27, 2017).  The far-reaching inferences it draws from that text are absurd.

*First*, the government misreads the message itself and misstates its context.  The message purportedly was sent by Mr. Litvak to a friend after the first sentencing and was ultimately passed on to Adam Siegel, an RBS trader who was investigated by the government and ultimately pled guilty.  As printed in the PSR, the message reads as follows:  "All good homie. This whole thing has been a nightmare.  But today was a victory.  I will continue to fight in the appeals court but knowing what my worst case is.  I will crush that sht if I have to do it."  PSR ¶ 32.  Read in context, this message merely conveys (1) that the process of investigation, arrest, trial, conviction and sentencing has been difficult ("a nightmare"); (2) that the two-year sentence was a relief given the government's request that Mr. Litvak serve a decade or more (108-135 months); (3) that Mr. Litvak would exercise his right to appeal; and (4) that if he was ultimately required to serve his sentence, he would get through it and come out a better man ("I will crush that sht if I have to do it").  These are natural human reactions to an ordeal of the kind Mr. Litvak and his family had just endured.  As the letters the Court has received indicate, Mr. Litvak has done his best to maintain a positive attitude throughout this difficult process, and the comments

in the text reflect that.[33]  But by no means do they suggest Mr. Litvak shrugged off the

devastating effects a 24-month sentence would have on his family.  *See* Ex. A at 1-2 (Dr. R.

Litvak Letter), *id.* at 21 (B. Bendett Letter).

*Second*, the government argued in its PSR submission that the text message somehow

caused Mr. Siegel to delay pleading guilty in his own case for several months—and further

implied that Mr. Litvak should face higher punishment for having caused this delay.  Numerous

inferential leaps are required to accept this outlandish conspiracy theory.  But even if the

government is right, all that means is that another defendant in a different case, facing different

evidence for alleged crimes that occurred prior to Mr. Litvak's first sentencing, was temporarily

encouraged by Mr. Litvak's resolve to assert his constitutional rights.[34]  This is irrelevant to the

task now before the Court.[35]

### c.  Just Punishment and Respect for the Law

A sentence of home confinement, combined with a fine of $250,000, would appropriately

"reflect the seriousness of the offense," "promote respect for the law," and "provide just

punishment" for Mr. Litvak's single-count conviction.  18 U.S.C. § 3553(a)(2).  The impact of

the fine itself should not be overlooked:  a $250,000 fine is more than triple the alleged loss

---

[33] *See, e.g.*, Ex. A at 23 (K. Blatt Letter), 30 (L. Keston Letter), 26 (J. Chayut Letter).

[34] The assumptions underlying the government's argument are offensive to the basic principles that underlie our criminal justice system.  The government was not entitled to a guilty plea in the Siegel case, Mr. Siegel had no obligation to waive his constitutional rights on the government's preferred timetable, and there was no reason why Mr. Litvak should have been downtrodden when describing his chances in an ultimately successful appeal.

[35] The government also mentioned to Probation the summons that Mr. Litvak, through his employment counsel, filed naming AllianceBernstein and Mr. Canter as defendants and subsequently withdrew.  The government's description mischaracterizes the purpose of the filing, which, as expressed on the record, was to preserve the ability to file a claim in the event it was appropriate after appeal.  Mr. Canter was never served with a complaint.  Before the summons was filed, it was run by Mr. Litvak's prior criminal counsel, who did not suggest it would be a violation of his conditions of release.  As soon as the government expressed concern, the summons was immediately withdrawn. *See* Jan. 28, 2015 Hr'g Tr. at 35-37.

associated with the only count of conviction, Count 4 and more than 28 times what the government calculates as the personal gain Mr. Litvak received on the Count 4 trade (5 to 12% of Jefferies' profit).  It also bears emphasizing that Invesco already has recouped the full amount of "loss" on Count 4 via its settlement with Jefferies (in fact, it recouped more than the alleged fraud loss, as Jefferies remitted all profit it made on the trade).

### 3.      Section 3553(a)(3)-(4): A Sentence of Home Confinement is Authorized under the Guidelines.

As noted above, Mr. Litvak has a Category I Criminal History and should be deemed to have a Total Offense Level of 11, which is in Zone B of the Sentencing Table.  *See* U.S.S.G. ch. 5, pt. A (Sentencing Table).  The Guidelines expressly authorize a sentence that includes home confinement and probation under these circumstances.  *See* U.S.S.G. § 5C1.1(c)(3) & cmt. n.3; *Gall v. United States*, 552 U.S. 38, 59 (2007) ("[Section] 3553(a)(3) directs the judge to consider sentences other than imprisonment.").  The Probation Office recommends that community service be part of any sentence, and the defense agrees.  In light of the personal characteristics described in detail in the attached letters, namely his good-natured personality and compassion for others, Mr. Litvak is well-suited to participate in any range of community service programs.

### 4.      Section 3553(a)(6): A Sentence of Home Confinement Would Not Result in Unwarranted Sentencing Disparities.

A sentence of home confinement will not result in unwarranted sentencing disparities. As the Court recognized during the 2014 sentencing, because every case and every defendant is different, it can be difficult to identify cases where "defendants with similar records . . . have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Such a task is particularly difficult here because Mr. Litvak was the first RMBS trader to be charged criminally in connection with the government's investigation and will be the first to be sentenced.  That said, a sentence of home confinement is reasonable under these facts.  Courts in this Circuit and

elsewhere have imposed sentences of home confinement even in fraud cases involving breaches

of trust, vulnerable victims, high loss amounts, or some combination of all of these.[36]

## IV.    CONCLUSION

These proceedings now have lasted half a decade—nearly two years longer than Mr.

Litvak worked at Jefferies.  This has been a life-altering experience for Mr. Litvak, and, even if

the Court were to order no punishment, he will continue to feel negative repercussions from this

case for the rest of his life.  Under these circumstances, the sentence requested by the defense

would achieve the goals outlined in Section 3553(a).  Any term of incarceration would be far too

severe.

In light of these considerations, the defense respectfully requests that the Court sentence

Mr. Litvak to a term of 8 months of home confinement, community service, and a fine of

$250,000.

---

[36] *See United States v. Diambrosio*, No. 2:04-cr-00066-BWK, 2008 WL 732031 (E.D. Pa. Mar. 13, 2008) (5 years of probation with 1 year of home confinement and restitution of $2.1 million after jury convicted of 10 counts of wire fraud causing $2.8 million in loss); *Prosperi*, 686 F.3d at 32 (on appeal from No. 1:06-cr-10116-RGS (D. Mass.)) (6 months of home confinement, 3 years of probation, and 1,000 hours of community service after jury conviction for mail fraud, highway project fraud, and conspiracy to defraud the government in connection with the Big Dig, a variance from 87 to 108 month advisory Guidelines range and $5.2 million in loss); *United States v. Strain*, No. 1:13-cr-00906-GBD (S.D.N.Y.) (6 months home confinement and community service for a talent agent who pled guilty to stealing more than $500,000 in client funds) (Ex. Q); *United States v. Recck*, No. 3:15-cr-0015-JAM (D. Conn.) (5 years of probation, the first 6 months of which must be served in home confinement, and 600 hours of community service for individual who admitted stealing $125,000 from a nonprofit and filing a false tax return) (Ex. R); *United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (appeal from No. 04-cr-00085 (D. Del.)) (2 years probation, including 3 months' home confinement after jury convicted of wire fraud related to reimbursements for an air force contract totaling $152,850 in loss); *United States v. Thomas*, No. 3:13-cr-00003-JBA (D. Conn.) (1 day in prison (time already served) and 2 years of supervised release with the first 3 months to be served in home confinement after defendant pled guilty to theft from an Indian tribal government) (Ex. S); *United States v. Bruce*, No. 3:15-cr-00016-AWT (D. Conn.) (3 years of probation, including the first 6 months in home confinement after guilty plea for defrauding contributors to a Sandy Hook-related charity) (Ex. T); *United States v. Roberts et al.*, No. 3:08-cr-00175-PLR-CCS (E.D. Tenn.) (4 years probation with 150 hours of community confinement after jury convicted defendants of multiple counts of trade secret theft) (Ex. U); *United States v. Musgrave*, 647 Fed. App'x 529 (6th Cir. 2016) (on appeal from No. 3:11-cr-00183 (S.D. Ohio)) (1 day in prison (time already served), 5 years supervised release with 24 months of home confinement, and a $250,000 fine where jury convicted defendant of wire fraud, bank fraud, and conspiracy with a loss amount of at least $1.7 million).

Respectfully Submitted,

Dated:  April 10, 2017

*/s/ C.J. Mahoney*
Dane H. Butswinkas (phv07986)
Adam D. Harber (phv07988)
C.J. Mahoney (phv08039)
Katherine A. Trefz (phv08040)
Williams & Connolly LLP
725 Twelfth Street, N.W.,
Washington, D.C.
Tel: (202) 434-5000
Fax: (202) 434-5029
dbutswinkas@wc.com
aharber@wc.com
cmahoney@wc.com
ktrefz@wc.com

Ross H. Garber (ct17689)
Michael G. Chase (ct28935)
SHIPMAN & GOODWIN LLP
1 Constitution Plaza
Hartford, CT 06103
Tel:  (860) 251-5000
Fax:  (860) 251-5099
E-mail: rgarber@goodwin.com
Email: mchase@goodwin.com

*Attorneys for Jesse Litvak*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of April, 2017, a copy of this memorandum was uploaded to and filed with the CM/ECF System for the United States District Court for the District of Connecticut, with a courtesy copy served by email to counsel of record for the government, Jonathan Francis, Heather Cherry, and William Nardini.


___*/s C.J. Mahoney*_____